## AFFIDAVIT

I, Christian Jardin, having been duly sworn, state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I am assigned to ATF's Providence office, and have been a Special Agent with ATF since 2001.  Based on my training and experience as an ATF Special Agent, I am familiar with federal firearms laws.  As an ATF Special Agent, I have been involved, either as lead agent or as a member of an investigative team, in numerous investigations of wrongful possession of firearms, including machineguns, wrongful transfer of firearms, and dealing firearms without a license.

2.      I submit this affidavit in support of a criminal complaint charging David Ladwig (born in February 1955) (hereinafter, "Ladwig") with

    a.      possession and/or transfer of a machinegun, in violation of 18 U.S.C. § 922(o),

    b.      sale of a firearm to an out-of-state resident, in violation of 18 U.S.C. 922(a)(5), and

    c.      engaging in the business of dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A).

3.      The information in this affidavit comes from my personal observations and investigation, my training and experience, information obtained from other law enforcement agents, and information from other sources as specified in the body of this affidavit.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter or investigation.

## Investigation

4.      In November 2018, ATF acquired information that suggested that Ladwig was engaged in the manufacture of firearms, including machineguns, and was searching for buyers.  Acquired information also suggested that 401-212-0974 (the call number from Cellphone #1) was Ladwig's cellular telephone number.

*Initial Conversation on November 11, 2018*

5.  On November 11, 2018, at approximately 12:19 pm, ATF Special Agent Michael Curran, a resident of Connecticut who was acting in an undercover capacity, telephoned 401-212-0974, the call number for Cellphone #1. The call was recorded. A male answered and, in ensuing conversation, identified himself as "Dave," and the male – later after Curran spoke with David Ladwig face-to-face – was identified by voice as Ladwig. During the call, Ladwig said that he made "ghost guns," or guns without serial numbers, by constructing guns from parts. Ladwig said that he could construct various types of pistols and rifles, including machineguns. Ladwig said that he had a machinegun available for $4,000. Curran expressed interest in the machinegun and asked Ladwig to send, via text message, pictures of guns he could sell. Curran explained that he was a Connecticut resident and would call when he expected to be in Rhode Island. Ladwig said that he lived on a boat in the Pawtuxet Village section of Cranston.

6.  Soon after the call, at approximately 12:28 pm, Curran received via text messages from Cellphone #1 four photographs. The first was of a rifle, and in text conversation, the sender described it as having a "reticle sight and aimpoint laser and suppressor" with a price of "1600.00" The second was of a rifle, and in text conversation, the sender described it as a "Full auto" with a price of "$4k." The third was of a pistol, and in text conversation, the sender described it as a "Sig p228 9mm" with a price of "850.00." The fourth was a pistol, and in text conversation, the sender described it as a "1911 in 45acp or 9mm" with a price of "750.00."

*Machinegun Purchase on November 15, 2018*

7.  On or about November 14, 2018, ATF records were reviewed and it was determined that Ladwig was not a licensed firearms dealer and did not have any firearms, including pistols and machineguns, registered to him in the National Firearms Registration and Transfer Record.

2

8.      On November 14, 2018, Curran telephoned Cellphone #1 and again spoke to Ladwig. Curran said that he would be coming to Rhode Island the next day to meet with Ladwig. Ladwig told Curran to come to 8 Aborn Street in Cranston.

9.      On November 15, 2018, at approximately 11:33 am, Curran drove to 8 Aborn Street in Cranston. At that address is a building, which is part of the Pawtuxet Cover Marina and contains shower facilities for those at the marina. Around the building is a parking area. In close proximity to the building is a boat launch. Curran parked in the parking area. Curran's car, an ATF undercover vehicle, was outfitted with audio and video recording devices positioned to capture interaction inside the car.

10.     Soon after parking, at approximately 11:33 am, Curran called Cellphone #1 and spoke to Ladwig. Curran advised that he had just arrived at the meeting location. Ladwig said that he was on the "big red boat" and could see Curran's car. Ladwig said he would bring the firearm with him so that Curran could look at it.

11.     At the time of the call, an ATF agent was from a distance observing a red and white yacht that was moored at Slip #3 at the Pawtuxet Cove Marina (hereinafter, the "Boat"). The interior of the main cabin was visible through the windows at the rear of the Boat. At the time of the call, the agent saw Ladwig appear in the Boat's main cabin. He appeared to have emerged from below deck. Ladwig had a cellular telephone to his ear and looked in the direction of Curran's car. Shortly thereafter, Ladwig left the Boat carrying a black case and walked to Curran's car.

12.     Inside Curran's car, Ladwig removed from the case what appeared to be a firearm receiver, the primary lower component of a complete firearm. Ladwig explained that he had made the item and explained that it was the receiver for a machinegun. Ladwig pointed out the components that allowed for automatic fire, including the auto sear and auto hammer. Ladwig also manipulated the selector switch, explaining how to move from the semi-automatic position to the automatic fire position. Ladwig also explained that the firearm was missing

3

certain parts, the full auto bolt carrier group.  Ladwig explained that he would be getting those parts by mail shortly.

13.     During the course of conversation, Ladwig removed another receiver from his case and compared it to the machinegun's receiver.  Ladwig explained how the two differed and described the work that went into converting an ordinary receiver into an automatic-fire capable receiver.  Ladwig explained that he had access to a machine shop in Rhode Island for his work.  Ladwig also said that he made semi-automatic pistols.

14.     After some negotiation, Curran paid Ladwig $2,800 for the machinegun receiver. Ladwig said that he could provide better prices for "bulk" purchases.

15.     As conversation continued, Ladwig explained that he could also construct silencers and discussed other firearms he could produce.  Before parting ways, Curran ordered a pistol with silencer from Ladwig, who said that it would be ready in about a week.  Ladwig explained that he had some but not all the parts for making the pistol.

16.     Shortly before leaving Curran's car, Ladwig said that he hopes that they could do more business together and that he would mail Curran the missing parts for the machinegun.

17.     Shortly after leaving Ladwig's company, Curran transferred custody of the machinegun receiver to me, and I had it sent to an ATF lab for further examination.  Daniel Hoffman, an ATF Firearms Enforcement Officer trained in the identification of machineguns, examined and tested the receiver.  He identified it as a machinegun receiver and determined that it had been constructed with the following M16 machinegun parts:  a hammer, disconnector, trigger, safety/selector, and automatic sear.  As such, in addition to identifying the receiver as a machine gun receiver he identified it as designed and assembled to function as a component of a machine gun.  Hoffman's testing included adding the upper components to the receiver, the bolt carrier group, and so equipped the entire assemble fired more than one shot, without manual reloading, by a single function of the trigger.

4

18.    I note that under 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b), the receiver of a machinegun alone qualifies as a "machinegun" under 18 U.S.C. 922(o) and as a "firearm" under 26 U.S.C. § 5861(d) and 18 U.S.C. § 922(a)(5) and (a)(1)(A).

*Text Communications on November 20, 2018*

19.    On November 20, 2018, Curran texted Cellphone #1, "Did you get a chance to get that out in the mail?" Cellphone #1 responded, "Going out today…. It needs to be measured with feeler gauge and checked for sear timing when installed." Curran then inquired about the other firearm that he had ordered: "[Y]ou good for the 1911 next week[?]" Cellphone #1 responded, "Waiting on frame and threaded barrel."

*Communications on November 27, 2018*

20.    On November 27, 2018, Curran telephoned Cellphone #1, Ladwig answered, and the two conversed. The call was recorded. Ladwig said that there had been a death in his family and that he had not been able to mail the bolt carrier group as earlier promised. Ladwig also said that he had not been able to buy the parts for the pistol Curran had ordered and requested that Curran pay a deposit for the pistol. Ladwig said that with a deposit of $400 he would have enough for the needed parts and for mailing the bolt carrier group for the machinegun. Curran ended the call saying that he would consider paying a deposit.

21.    After the call, Curran received, via text message from Cellphone #1, a photograph of the bolt carrier group for the machinegun receiver. Curran responded with a text: "Nice, can you drop it in the mail for me?" Cellphone #1 replied, "Got no money right now." Some time later, Cellphone #1 sent another photograph, this one of pistol parts. A text message following the photograph stated, "This is your 1911 [a type of pistol] minus the frame and booster…. I am in to this for over 600 at this point and balance of parts is $400. You have zero vested in this at this point and expect me to carry the full cost and hope you show up with cash." Curran texted back that he would get paid in a week and a half and would bring the deposit. Cellphone #1 responded, "Okay."

*December 8, 2018*

22.      On December 8, 2018, Curran and Ladwig exchanged text messages.  Ladwig wrote, "You coming down?"  Curran responded, "Yes, will be there middle of week, probable Wednesday[.]"  Ladwig indicated that he needed money from Curran to place an "order" for "parts" and could not guarantee the price beyond "today."  Curran responded, "I just cant get you the deposit for a few days.  I am definitely coming, i really want that[.]"

*December 12, 2018*

23.      Today, December 12, 2018, Curran drove in his ATF undercover vehicle to the marina and met Ladwig.  After Curran arrived, Ladwig was observed stepping out of the Boat and walking to and stepping into Curran's vehicle.

24.      Shortly after entering the vehicle, Ladwig provided Curran with the aforementioned bolt carrier group for the machinegun receiver.  Ladwig was arrested soon after.

25.      After being advised of his rights, Ladwig told agents that he resided on the Boat, had sold the machinegun receiver to Curran, and had done so because he needed money.

26.      Agents searched the Boat and inside found, among other things, and AR-15 receiver, ammunition, firearm parts, and silencer parts.

## Conclusion

27.     Based on the above, I believe that there is probable cause to believe that Ladwig

committed the offenses enumerated in paragraph 2 and described above.


_____
Special Agent Christian Jardin
Bureau of Alcohol, Tobacco and Firearms


Subscribed and sworn to before
me this 12th day of December 2018,
at Providence, Rhode Island


_____
LINCOLN D. ALMOND
United States Magistrate Judge